649 So.2d 1350 (1994)
STATE of Florida, Petitioner,
v.
Augustus J. RAWLS, Respondent.
No. 82793.
Supreme Court of Florida.
October 27, 1994.
Rehearing Denied February 9, 1995.
Robert A. Butterworth, Atty. Gen., James W. Rogers, Bureau Chief, Crim. Appeals, and Carolyn J. Mosley, Asst. Atty. Gen., Tallahassee, for petitioner.
Nancy A. Daniels, Public Defender and Kathleen Stover, Asst. Public Defender, Tallahassee, for respondent.
GRIMES, Chief Justice.
We review Rawls v. State, 624 So.2d 757 (Fla. 1st DCA 1993), because of its conflict with Bierer v. State, 582 So.2d 1230 (Fla. 3rd DCA), review denied, 591 So.2d 180 (Fla. 1991). We have jurisdiction under article V, section 3(b)(3) of the Florida Constitution.
*1351 Rawls was charged with committing capital sexual battery on M.R., a male child. Prior to trial, the State filed Williams rule[1] notices of its intent to introduce evidence of previous acts of sexual battery committed by Rawls on three other young males. The defense objected, and a hearing was held. The judge decided to allow the introduction of the evidence, finding it was admissible to corroborate the testimony of M.R. under Heuring v. State, 513 So.2d 122 (Fla. 1987), and the case proceeded to trial.
At trial, M.R.'s mother testified that she met Rawls through a neighbor, and they became friendly. Rawls told her that he was having problems where he lived and that he desired to live with a family with children. Subsequently, Rawls moved in with M.R.'s family, after agreeing to pay rent and to furnish his own food. Rawls remained in the home for ten days. During that time, he slept in M.R.'s room while M.R. slept on the couch in the living room. M.R. testified that when no one but Rawls and M.R. were present, Rawls touched M.R.'s penis and placed it in his mouth. M.R. did not tell anyone because he was afraid.
The State then presented the Williams rule evidence, which was summarized by the district court as follows:
The state's collateral-crime evidence consisted of the testimony of 16-year-old J.F., who stated that [Rawls] had lived with his family. [Rawls] was good to his family while he lived with them and bought J.F. gifts, gave him money, and took him fishing. J.F. called him "Uncle Gus." J.F. testified that [Rawls] put his mouth on his penis. He was approximately eight or nine when this first occurred. No one else was present. [Rawls] told J.F. not to tell anyone what he did to him.
J.K.F., J.F.'s brother who was 20 years old at the time of the trial, testified that [Rawls] was his mother's friend and had moved in with the family. J.K.F. was approximately eight or nine when [Rawls] first came to live with them, and he lived with them for several years. [Rawls] was good to the family and to him. He bought J.K.F. clothes and toys, paid the bills, and paid rent to his mother. J.K.F. testified that [Rawls] put his mouth on his penis when no one was around and that he told him not to tell anyone. This usually occurred while J.K.F. was in his bedroom between 2:30 and 3:00 a.m.
Finally, T.S., then [twelve and one-half] years old, testified that he met [Rawls] when he was approximately nine years old. [Rawls] moved in with his family and helped them to pay bills and groceries. [Rawls] was good to him  he bought him clothes and drinks. T.S. testified that [Rawls] first put his mouth on the boy's penis while the two were in [Rawls'] trailer, and that similar acts occurred after [Rawls] moved in with T.S.'s family. No one was present during these occurrences, and [Rawls] told T.S. not to tell anyone. [Rawls] lived with his family approximately one to one and a-half years.
Rawls, 624 So.2d at 759.
At the close of all of the evidence, the trial court gave the following Williams rule instruction which was modified to include the emphasized language:
The evidence which has been admitted to show similar crimes, wrongs, or acts allegedly committed by the defendant will be considered by you only as that evidence relates to proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident on the part of the defendant or to corroborate the testimony of the alleged victim in this case. However, the defendant is not on trial for a crime that is not included in the information.
(Emphasis added.) Rawls was convicted.
On direct appeal, Rawls argued that the trial court erred by: (1) admitting the Williams rule testimony and (2) modifying the jury instruction to include corroboration of the victim's testimony as a proper use of collateral-crime evidence. Regarding the first issue, the district court found that the *1352 testimony of J.F., J.K.F., and T.S. was admissible. However, the court reversed and remanded on the second issue. The court found that there was no evidence presented that the charged offense arose in a familial or custodial setting. Therefore, the court held that instruction was an erroneous statement of the law because section 90.404(2)(a), Florida Statutes (1991), does not list victim corroboration as a proper purpose for similar-fact evidence, and Heuring only authorizes use for corroboration in a familial or custodial situation. The court also held that the instruction was not harmless error.
The Williams rule, codified at section 90.404(2)(a), Florida Statutes (1991), provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but is inadmissible when the evidence is relevant solely to prove bad character or propensity.
In Heuring, this Court expanded the Williams rule in cases involving sexual battery committed within a familial context. The Court recognized that such cases present special problems. Heuring, 513 So.2d at 124. Because the victim knows the perpetrator, the enumerated purposes of the Williams rule, such as identity, are not at issue. Also, the victim is typically the sole eyewitness and corroborative evidence is scant. The victim's credibility is the focal issue. Id. Accordingly, we held that in the narrow class of cases involving sexual battery within a familial context similar fact evidence is admissible to corroborate the testimony of the victim. Id. at 124-25.
In the instant case, the district court held that Rawls' conduct did not occur within a familial context and, therefore, the similar fact evidence could not be used to corroborate the M.R.'s testimony. The State argues that a familial relationship did, in fact, exist.
The existence of a familial relationship depends on the particular facts of a case. The relationship in Heuring was clearly familial. The defendant was charged with the sexual battery of his stepdaughter, and the similar fact evidence was that the defendant had previously sexually battered his daughter. Heuring, 513 So.2d at 123; see also Calloway v. State, 520 So.2d 665 (Fla. 1st DCA) (familial relationship existed where victim was defendant's stepdaughter), review denied, 529 So.2d 693 (Fla. 1988).
The First District Court of Appeal has extended "familial relationship" to include individuals who are not related by blood or marriage. In Coleman v. State, 485 So.2d 1342 (Fla. 1st DCA 1986), the defendant was charged under section 794.011(4)(e), Florida Statutes (1983), with committing sexual battery on a fourteen-year-old female when the defendant was "in a position of familial, custodial, or official authority over the victim." The defendant was neither the natural father nor stepfather to the victim at the time the offense allegedly occurred, and he argued that this precluded his prosecution under the statute. Id. at 1344-45. The court found that the use of the words "familial" and "custodial" evidenced an intent to include within the statute's proscription those persons maintaining a close relationship with a child and living in the same household as a child. Id. at 1345. The court stated:
Although [the defendant] was neither the victim's natural father nor her stepfather, nor does the evidence disclose his status as in loco parentis to the victim at the time of the offense charged, [the defendant] did live with the child and her mother in the same household substantially most of the time from 1978 through 1984. The victim's testimony discloses that during such period, she loved, trusted and obeyed [the defendant] as any child would love, trust and obey her natural father. Under such circumstances, the state sufficiently proved that [the defendant] assumed a position of familial or custodial authority over the victim, and we consider that the legislature [in enacting section 794.011(4)(e)] has clearly manifested an intent to protect children who come under the dissolute influence of such persons, even in the absence of the showing of consanguinity or affinity.
*1353 Id. at 1345-46; see also Saffor v. State, 625 So.2d 31, 32 (Fla. 1st DCA 1993) (Familial relationship exists where "the victim's relationship with [the defendant] was tantamount to a stepson. He was the son of [the defendant's] girlfriend, a woman with whom [the defendant] had fathered two children."), review granted, 637 So.2d 236 (Fla. 1994).
That court has also found a familial relationship where the defendant and the victim did not live in the same home. In Stricklen v. State, 504 So.2d 1248, 1250 (Fla. 1st DCA 1986), the court found a familial relationship where the defendant did not reside in the victim's home, but the defendant "had cultivated a very close relationship to the victim over a considerable period of time, assuming responsibility for his care practically every weekend."
In Bierer, 582 So.2d at 1230, the Third District Court of Appeal adopted a broad construction of the term "familial relationship." The court found a familial relationship between the defendant and three victims where two of the victims were the defendant's stepdaughters, and one was a neighborhood friend of the stepdaughters. Id. at 1232. Regarding the neighborhood friend, the court stated that "the defendant exercised parental-type supervision [over the child] on a daily basis at his home." Id. In State v. O'Brien, 633 So.2d 96 (Fla. 5th DCA 1994), no familial relationship was found to exist. The defendant's sister operated a baby-sitting service in their home for several neighborhood children, including the victims. The victims alleged that they were molested by the defendant when the defendant's sister left the home to run errands and they were left in the defendant's charge. Id. at 97.
There is no single definition or description of what constitutes a "familial relationship" in the context of child sexual battery. The cases discussed above illustrate that the determination of whether a familial relationship exists must be done on a case-by-case basis. Consanguinity and affinity are strong indicia of a familial relationship but are not necessary. Also, the defendant and victim need not reside in the same home. The relationship must be one in which there is a recognizable bond of trust with the defendant, similar to the bond that develops between a child and her grandfather, uncle, or guardian. Where an individual legitimately exercises parental-type authority over a child or maintains custody of a child on a regular basis,[2] a familial relationship may exist for purposes of the admissibility of collateral crimes evidence under Heuring.
In the instant case, it is unnecessary to decide whether Rawls had a familial relationship with the victims of the collateral crimes because it is clear that at the time Rawls' illicit conduct was discovered, his relationship with the victim in this case had not yet developed to the point at which it could be characterized as "familial." Rawls was not related to M.R. by blood or marriage. While Rawls lived in M.R.'s home, he was essentially a boarder. Rawls did not exercise any custodial or supervisory authority over M.R. There was no evidence that M.R. looked upon Rawls as a member of the family. Accordingly, the district court of appeal was correct in holding that the charged offense did not occur within a familial or custodial setting.
Notwithstanding, the court below held that the collateral crime evidence was admissible, apparently on the premise that it was relevant to prove absence of mistake. Rawls, 624 So.2d at 760. However, mistake was not an issue in the case. We believe that the collateral crimes evidence was admissible because the testimony of T.S., J.F., and J.K.F. regarding Rawls conduct was "strikingly similar" to M.R.'s testimony, and the evidence was relevant to corroborate M.R.'s testimony. Rawls gained access to all of his victims in the same manner. First, Rawls, who was not related to any of the victims' families, befriended the boys' mothers. Then, he arranged to move into their homes. He paid rent, bought groceries, and was generous to the family members. After *1354 gaining access, Rawls molested male youths of approximately the same age in their homes while no one else was present. He instructed all of his victims not to tell anyone what had occurred. Clearly, the charged and collateral offenses committed by Rawls share the unique combination of characteristics required to meet the strict standards of the Williams rule. Further, the probative value of the similar fact evidence outweighed its potential for undue prejudice. § 90.403, Fla. Stat. (1991).
We acknowledge that Heuring only established the principle that similar fact evidence was admissible for the purpose of corroboration in a familial sexual battery case. However, as observed by Professor Ehrhardt:
Although the Heuring opinion appears to limit its theory of admissibility of other act evidence to acts involving sexual battery within the familial context, its rationale may extend to the admission of sexual acts upon other children. The rationale would also seem to be applicable whenever the defense in a sexual battery prosecution is that the victim fabricated the incident, rather than that the wrong person has been charged. The jury has little basis to determine the victim's credibility if the defense is that the incident never occurred. The seminal law review article suggests that in this situation the prosecution should be able to show that the defendant engaged in similar conduct to corroborate the victim's testimony. In cases where the victim is not acquainted with the defendant, the issue is whether the victim was mistaken in the identification of the defendant, rather than whether the victim is fabricating. In this latter situation, the Heuring rationale would not be applicable and the evidence would not be admissible to corroborate. If the similar fact evidence is to be admitted, it must be to prove some other material issue.
Charles W. Ehrhardt, Florida Evidence § 404.18 at 183-84 (1994 ed.) (footnotes omitted). The seminal law review article referred to above is found at 25 U.C.L.A.L.Rev. 261 (1977), which is the same law review article cited with approval in Heuring.[3] Even though Rawls was not in a familial relationship with M.R., identity was never an issue in the case. However, the credibility of M.R.'s testimony was very much an issue, and the similar fact evidence was properly admitted to corroborate his testimony.
In view of our analysis, it is evident that the trial judge correctly instructed the jury that the evidence of similar crimes could be considered as relating to proof of corroborating the testimony of the alleged victim. Accordingly, we quash the district court's decision *1355 and remand with directions to reinstate Rawls' conviction and sentence.
It is so ordered.
OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] § 90.404(2), Fla. Stat. (1991); Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[2] A legitimate custodial relationship would be the equivalent of a familial relationship for purposes of permitting the introduction of similar fact evidence to corroborate the victim's testimony of sexual battery under Heuring. See Hallberg v. State, 649 So.2d 1355 (Fla. 1994), for a discussion of what constitutes a custodial relationship.
[3] The author of the law review article insightfully distinguishes circumstances for which similar fact evidence may be introduced in sex cases:

In a sense, of course, identity is "in issue" in every case. The prosecution must prove beyond a reasonable doubt that the defendant committed the crime. With regard to identity, however, sex cases may be analyzed in terms of two distinct categories. In the first category are those cases in which the victim has been molested by an unknown assailant, someone whom the victim had not encountered on any occasion prior to the time of the offense. Also in this first category are those cases where the victim is simply unable to make an in-trial identification because of the circumstances under which the offense was committed. For instance, a rape victim may have been attacked from behind and knocked unconscious. In this latter situation, the victim may or may not be actually acquainted with the accused. In either event, identity is "in issue." The critical question is not so much whether the crime was committed as whether the accused was the individual who committed it. The prosecution will have to convince the jury that the accused, out of countless possible candidates, was the individual who committed the crime. If the victim makes an in-trial identification, the focus for the jury will be on the victim's faculties for identification and factors bearing on it.
In the second category, the accused is a previous acquaintance of the victim. A typical example is the child molestation case in which the accused is the victim's parent or teacher. The focus in this type of case is likely to be on whether the alleged crime was ever committed. Identity is not "in issue." The issue will be the credibility of the victim. Is the victim telling the truth about the crime? If the circumstances under which the crime was committed indicate that the victim could have made an identification error, then the case belongs in the first category, and not the second.
Robert N. Block, Comment, Other Sex Offenses, 25 U.C.L.A.L.Rev. 261, 283 n. 101 (1977).