963 So.2d 321 (2007)
Donald Stanford LOWRY, Appellant,
v.
STATE of Florida, Appellee.
No. 5D05-1808.
District Court of Appeal of Florida, Fifth District.
August 17, 2007.
*322 Mary Elizabeth Fitzgibbons of Quinones, Fitzgibbons, Pfister & Oliver, P.L., Kissimmee, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Rebecca Roark Wall, Assistant Attorney General, Daytona Beach, for Appellee.
THOMPSON, J.
Donald Stanford Lowry requested rehearing on the basis that counsel did not understand the reason for our per curiam affirmance. To assist counsel's understanding and reiterate the standard for filing a motion for rehearing, we withdraw our previous opinion and enter this extended opinion that affirms Lowry's conviction and sentence.
Lowry was convicted for trafficking in 28 grams or more of heroin. On appeal, he claimed the court erred by: (1) admitting testimony about a drug deal that never occurred; (2) admitting into evidence tapes and translations of two phone calls between Lowry and an informant; (3) dismissing a juror who expressed doubt about police credibility based on her knowledge of the scene; (4) not dismissing a juror based on his knowledge of Spanish; (5) *323 permitting the State to strike "nearly all"that is, twojurors who may have been Hispanic without determining the State's motive; and (6) permitting the State to offer opinion in closing and to mischaracterize evidence. We outline the facts, then fully address seriatim the six grounds for relief raised in Lowry's appeal.

FACTS
Summary of crime.
Agent George Duke, Officer Edwin Santos, and a confidential informant ("informant") testified about the heroin deal for which Lowry was convicted. The informant made two monitored, recorded telephone calls on 14 August 2003 in which the informant and Lowry set up a drug deal. That night, the informant and Santos drove to a parking lot and met Lowry. The informant exited Santos' car, received 30 grams of heroin from Lowry, and reentered Santos' car. Santos retrieved $3,000 from his trunk and gave it to the informant, who returned to Lowry's car, gave Lowry the money, and returned to Santos' car. The informant was searched before and after the deal. The police did not immediately arrest Lowry because they were trying to set up a future transaction to net other co-conspirators. The deal did not occur, and the police arrested Lowry in September 2003. Lowry conceded at trial that he spoke with the informant on 14 August 2003, and met him in a parking lot where the informant twice entered and exited his vehicle, but denied that a drug deal occurred.
The future drug deal.
Before trial, Lowry moved to exclude evidence that the police tried to set up a future deal. The State wished to introduce testimony about the reason the police did not immediately arrest Lowry, but allowed him to leave with the $3,000 from the deal. The court ruled their intent to set up another deal for the following week was relevant to their failure to arrest Lowry immediately. Accordingly, Duke testified he did not stop Lowry because that was the first of two heroin purchases that the police attempted to make; the second was going to be for 60 grams of heroin. This was a "buy/walk," where the police make a controlled purchase of narcotics and allow the individual to leave to further develop the investigation and possibly identify other co-conspirators. The jury heard that Lowry was not arrested the first night, but no other deal occurred; rather, he was arrested on 4 September 2003.
Tapes and transcripts.
Before trial, Lowry requested that, when the State presented any translation, they also play the taped conversations. At first, counsel did not admit the transcripts were accurate, but expressly did not object to them: "I am not . . . stipulating that those transcripts are accurate. What I am doing is not objecting to them presenting them to the jury, because I thinkwhile I see things that I may think are a mistake . . . I'm not gonna object to it." The State offered to have the translator testify, but defense counsel specifically stated that was unnecessary. Counsel requested that the tapes be presented in addition to the transcripts. He clarified to the court he did not dispute their accuracy: "Actually, I'm gonna argue that they're accurate, the way they're written."
Agent Duke testified about the monitored phone calls between the informant and Lowry. Agent Duke dialed the number, recorded the conversations, and created the tapes, that accurately depicted the calls. One of the taped voices was the informant's. Lowry objected that the tapes were not relevant because the other *324 voice was unknown, but the court admitted the tapes, subject to being "tied up" by other witnesses. The informant testified the other voice was Lowry's. With that predicate, Lowry did not object to the tapes and twice stated he had no objection to the translations. The court announced its intention that, because both sides agreed the transcripts should go to the jury, the court would admit them into evidence; Lowry did not object. After the tapes were played for the jury, the informant testified about the conversations and the meaning of various phrases within them.
In his opening statement, defense counsel suggested that neither of the recorded voices was Lowry's. On cross-examination, Lowry first avoided conceding his voice was on the tape, but remembered "some of what [the tapes] were talking about." He conceded that the portion of the voicemail message heard on the tapes was his. He later admitted the voice "could have been" his and, later still, believed that it was his voice after all.
There was little discussion of any inaccuracies in the translations and transcripts and none concerning any inaudible portions. There was some confusion regarding whether the informant was the first or second voice in the second transcript. Lowry argued that, where one transcript said the name "Rene" had been used, he actually thought the tape had said "Danny."[1] Also, the transcript erroneously translated "after" to mean "if."
One juror's dismissal.
Santos testified that the grocery store where the deal occurred faced north. After the first day of testimony, one juror raised an issue heard outside the rest of the jury's presence. She lived near the store and thought the officer said it faced south, which led her to distrust the officer. She said it would be difficult to put aside her independent knowledge and decide the case only on the testimony and said she could no longer be fair and impartial. The court noted that both sides previously agreed to challenge for cause.[2] It discussed several cases concerning jurors' independent knowledge and concluded it had a reasonable doubt about her ability to disregard her personal knowledge and follow the court's instructions. Accordingly, over Lowry's objection, the court dismissed the juror and seated the alternate juror in her place.
A Hispanic juror's retention.
After the court decided to dismiss the previous juror, defense counsel moved to dismiss a Hispanic juror who, because he spoke Spanish, also had "independent knowledge"; Lowry said "the same argument" that applied to the previous juror applied to him. The court pointed out that Lowry asked the jury in his opening statement to use their knowledge of Spanish, but said it would caution the Hispanic juror not to share his own translation with the other jurors or use it in deliberation. The court had instructed the jury not to discuss the case and had no reason to believe the Hispanic juror violated that order. The court delivered the following instruction, which Lowry expressly approved: "You may not use your independent knowledge of Spanish to make your decision nor may you impart this knowledge to other jurors."[3]
*325 Voir dire and Hispanic jurors.
During voir dire, nine potential jurors indicated they had at least some knowledge of Spanish. Lowry and the State agreed two should be excused for cause. Lowry peremptorily struck one, and the State peremptorily struck two. The State expressly did not object to three of these potential jurors. Lowry did not raise the issue of racial motivation and did not object to the panel.
The State's closing argument and cross-examination of Lowry.
Agent Duke had arrested the informant, who received a departure sentence in return for furthering other drug investigations. Though he had faced a 25-year minimum mandatory sentence, he was sentenced to 12 years. In closing, Lowry argued that the informant had a motive to lie so that he could get out of prison earlier to see his child. In response, the State noted that, despite Lowry's concern, the informant had already been sentenced, so the result of Lowry's case did not affect him. The State later said "[b]ecause he did set up this deal, he's already been sentenced, and . . . he was subpoenaed to testify under oath, to get on the stand and tell the truth. . . . That's what he did yesterday, he told the truth of what happened." Lowry did not object.
During Lowry's cross-examination, the State asked where the transcript mentioned not wanting "the people to be waiting with that money." The court sustained counsel's objection that that was not what the transcript said. The State then asked the correct questionwhether he said "I don't want to be going around at with that money." When the State erroneously asked about "people" again, Lowry objected. After the State rested, Lowry moved for mistrial based on prosecutorial misconduct because the State "kept adding words that were not there" and tried to confuse Lowry. The State responded its paraphrasing was unintentional; it apologized when it said "you" rather than "I." The court denied the motion for mistrial, concluding the jurors had the transcripts during cross-examination and could see what it actually said.

ANALYSIS
The "future drug deal."
The admission of evidence and the determination of its probative value is reviewed for an abuse of discretion. E.g., Huck v. State, 881 So.2d 1137, 1151 (Fla. 5th DCA 2004). Here, the police's attempt to set up another drug deal was relevant to the timing of his arrest and was not introduced, as Lowry argues, as impermissible similar fact evidence. There is a fine line between explaining police activity and including incriminating and usually unessential details. Johnson v. State, 920 So.2d 1282, 1283-84 (Fla. 4th DCA 2006) (citing Harris v. State, 544 So.2d 322, 324 (Fla. 4th DCA 1989)). The officers, by limiting their testimony to the fact they were attempting to set up another deal, provided a complete picture of the transaction in this case by explaining why Lowry was allowed to walk. Id. at 1284 (holding that implying Johnson was involved in other similar crimes was not necessary to explain logical series of events). Even if we believed this testimony was erroneously admitted, we would conclude, like Johnson, that the error was harmless beyond a reasonable doubt. Id. The jury repeatedly heard all testifying parties state that the second deal never occurred and, contrary to Lowry's claim that the State argued he had to be guilty because there was a 60-gram agreement between the informant and Lowry, the State's focus remained on the single deal for which Lowry was charged and convicted. We are not persuaded *326 by Lowry's arguments that the court, in admitting this testimony, offered the prosecutor "carte blanche to misrepresent evidence," that the evidence was "fictional evidence," or that the questioning on this issue constituted "flagrant and pervasive" "prosecutorial misconduct." Lowry failed to show on appeal how the court abused its discretion.
The tapes and translations.
Lowry argues on appeal that "considerable dispute" surrounded the transcripts, that the unintelligible portions of the tape were so substantial they deprived the audible portions of relevance, and that the tapes and transcripts were not properly authenticated. Lowry's representations on this issue are misleading. Each claim is unsupported by the record and unpreserved for review.
As to the transcripts, Lowry repeatedly failed to object to their admission. Initially, he did not stipulate that they were accurate, but expressly did not object to their admission. Moreover, when the State asked whether it needed to procure the translator who provided the translations, Lowry averred that it was unnecessary. Later, he argued that he would say "that they're accurate, the way they're written." On three occasions, he announced no objection to the transcripts being distributed to the jury or admitted into evidence. As to the tapes, Lowry expressly requested that they be played for the jury. Agent Duke and the informant testified about their creation and accurate depiction of the conversations. Lowry later reluctantly conceded that the voice was his while arguing his perception of the calls. Lowry's sole objection to the tapes was on the basis of relevance, until the informant testified that the other voice was Lowry's; then, he had no further objection. Further, despite Lowry's misleading claim that there was "considerable dispute" about the transcripts' accuracy, the record reveals that the only questions regarding their accuracy concerned whether the informant was male number one or male number two on one tape, whether the informant called Lowry "Rene" or "Danny" on one tape, and whether the translator incorrectly translated one preposition.
In summary, Lowry failed to object to the admission of the transcripts, and any error is unpreserved for review. See, e.g., Miller v. State, 934 So.2d 580, 581 (Fla. 3d DCA 2006). His arguments on appeal regarding the transcripts and tapes were not made at trial and, accordingly, were not preserved for appeal. See, e.g., Becraft v. State, 910 So.2d 413, 414 (Fla. 4th DCA 2005). We are not persuaded by Lowry's assertion, without elaboration, that "fundamental error occurred and/or that his objections were sufficient to preserve the issue for appeal and the Trial Court abused its discretion in admitting the evidence."
Dismissing a juror who expressed doubt about her impartiality, not dismissing a juror on the basis that knowing Spanish constitutes possessing independent knowledge of the case, and not holding sua sponte hearings on racial motivations where Lowry did not object.
Lowry raised three misleading, inconsistent, and groundless arguments dealing with jurors in this case. First, Lowry framed the dismissal of one juror as the erroneous exclusion of an African-American juror who distrusted police. Lowry wholly ignores the juror's statement that she felt she could not be fair and impartial and might not be able to decide the case based solely on the evidence presented. The court did not abuse its discretion in dismissing the juror, whose expressions of doubt about her ability to decide the case impartially easily provided a reasonable *327 doubt about her ability to decide the case solely on the evidence. See Wilson v. State, 608 So.2d 842, 843 (Fla. 3d DCA 1992); Graham v. State, 470 So.2d 97, 97-98 (Fla. 1st DCA 1985). Even if there was error, it was harmless because the juror was replaced by a duly selected alternate who was present for the entire proceedings, and we could conclude beyond a reasonable doubt that using the alternate did not affect the verdict. See Burgal v. State, 740 So.2d 82, 83-84 (Fla. 3d DCA 1999); Graham, 470 So.2d at 98.
Lowry's next argument equates the dismissal of the partial juror with the court's error in not dismissing a juror who spoke Spanish. The court did not abuse its discretion by failing to dismiss a juror who understood Spanish when there was no evidence that the juror could not be fair and impartial due to his "independent knowledge." Any error would be harmless because we find beyond a reasonable doubt that retaining the juror did not affect the verdict. E.g., State v. DiGuilio, 491 So.2d 1129 (Fla.1986). At any rate, we do not accept Lowry's suggestion, devoid of citation or reasoning, that any juror who speaks Spanish must be excluded from deciding any case in which the Spanish language was spoken.
But we do note that Lowry's argument regarding the Spanish-speaking juror is wholly inconsistent with his next frivolous assertionthat the court abused its discretion by failing to sua sponte hold a Neil[4] hearing when the State used two peremptories to strike jurors who may have been Hispanic. Arguably, the court should have conducted a Neil inquiry had Lowry objected to the State's peremptory challenges. See, e.g., Whitby v. State, 933 So.2d 557, 563 (Fla. 3d DCA 2006). Even if he had challenged the strikes, Lowry's Neil claim would have been unpreserved for appellate review because he did not renew (or make) his objection before the jury was sworn. See, e.g., Carratelli v. State, 915 So.2d 1256, 1259 (Fla. 4th DCA 2005) (citing Zack v. State, 911 So.2d 1190 (Fla.2005)). We are not persuaded by Lowry's unsupported claim that "he sufficiently preserved this issue for appeal and/or that the error was . . . fundamental."
The State's "mischaracterization" of the evidence in closing.
Lowry argues that the State's closing comments about the informant's lack of motive to lie was reversible error. However, "the prosecutor's comments during closing were in direct response to argument made by the defense." Pagan v. State, 830 So.2d 792, 809 (Fla.2002). Moreover, Lowry did not object to the State's closing argument and cannot show the comments constituted fundamental error, i.e., "that [which] reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Anderson v. State, 841 So.2d 390, 403 (Fla.2003) (citations omitted).
Lowry also argued that he was entitled to a mistrial for the State's misconduct during its cross-examination of Lowry, i.e., its erroneous references to "people," or its use of "you" rather than "I," when referring to the transcript. The trial court's decision on a motion for mistrial will not be reversed absent an abuse of discretion. Id. "A mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial." Id. The trial court noted that the jury had the transcripts for review during the cross-examination and denied the motion. Even had *328 Lowry's motion been timely made, none of the State's conduct during cross-examination can be said to vitiate the entire trial such that the court abused its discretion by denying Lowry's motion. We are not persuaded that Lowry's passionate discussion on appeal of inapposite cases in which defendants timely objected to prosecutorial comments sheds any light here.
Lowry's motion for rehearing.
Lowry's motion for rehearing simply repeats his frivolous arguments on appeal, levels unjustified abuse toward the prosecution, and reargues the merits of the court's opinion in violation of Florida Rule of Appellate Procedure 9.330(a). See Amador v. Walker, 862 So.2d 729, 733 (Fla. 5th DCA 2003). When we issued a per curiam affirmance, citing various opinions, it should have been obvious that we disagreed with Lowry's belief that "fundamental error" is merely anything he deems to be fundamentally erroneous. See id. Yet Lowry's counsel filed a motion for rehearing that presented nothing new, save for counsel's displeasure with our ruling and counsel's concession she found it "difficult, if not impossible, . . . to discern [our] reasoning." We trust that this opinion reduces or eliminates counsel's confusion. However, unfamiliarity with fundamental error doctrine and Florida Rule of Appellate Procedure 9.330(a) is not a sufficient basis for a motion for rehearing. See, e.g., Lawyers Title Ins. Corp. v. Reitzes, 631 So.2d 1100, 1100-01 (Fla. 4th DCA 1993).
AFFIRMED.
MONACO and EVANDER, JJ., concur.
NOTES
[1] Lowry conceded that people called him "Donny" and that the voice on the second tape said "Donny."
[2] The juror stated in voir dire that she did not think she could focus on the trial. Lowry and the State agreed to a for cause challenge, which the court denied.
[3] Nevertheless, Lowry suggested in closing argument that jurors who knew Spanish should listen carefully to the tapes.
[4] State v. Neil, 457 So.2d 481 (Fla.1984).