977 So.2d 673 (2008)
Steven K. OLIVER, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-2005.
District Court of Appeal of Florida, Fifth District.
February 29, 2008.
*675 James S. Purdy, Public Defender, and Ailene S. Rogers, Assistant Public Defender, Daytona Beach, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Bonnie Jean Parrish, Assistant Attorney General, Daytona Beach, for Appellee.
PLEUS, J.
Oliver appeals his convictions on six counts of sexual battery on a child by a person in familial or custodial authority and one count of lewd and lascivious molestation of a child. We affirm but write to address four of Oliver's arguments on appeal.

Motion for Judgment of Acquittal
Oliver argues that the trial court erred in denying his motion for judgment of acquittal because the State failed to present evidence that these crimes were committed while Oliver was in a position of familial or custodial authority. We disagree.
The de novo standard applies to reviewing the denial of a motion for judgment of acquittal. Harris v. State, 954 So.2d 1260, 1261 (Fla. 5th DCA 2007). The terms "familial or custodial authority" are not defined in Chapter 794, but they are defined in the case law. Familial authority and custodial authority are not the same. Crocker v. State, 752 So.2d 615 (Fla. 2d DCA 1999). In Pozek v. State, *676 803 So.2d 768, 769-70 (Fla. 5th DCA 2001), we adopted the following definitions:
In State v. Rawls, 649 So.2d 1350, 1353 (Fla.1994), the supreme court defined the concept of "familial relationship" in the context of the sexual battery of children. Although the court in that case addressed the concept for the sole purpose of determining whether similar fact evidence was admissible to corroborate the testimony of a minor victim of sexual battery, the definition is nonetheless helpful in deciding whether sufficient evidence of familial or custodial authority has been presented to uphold a conviction under section 794.011(8)(b). In Rawls, the court concluded that the determination of a "familial relationship" must be done on a case-by-case basis. Id. at 1353. The court explained:
Consanguinity and affinity are strong indicia of a familial relationship but are not necessary. Also, the defendant and victim need not reside in the same home. The relationship must be one in which there is a recognizable bond of trust with the defendant, similar to the bond that develops between a child and her grandfather, uncle, or guardian. Where an individual legitimately exercises parental-type authority over a child or maintains custody of a child on a regular basis, a familial relationship may exist for purposes of the admissibility of collateral crimes evidence. . . .
In the instant case, there was sufficient evidence to deny the motion for judgment of acquittal on this element. Oliver was charged with committing various sex acts upon twin teenage girls, D.P.E. and D.J.E. Their mother, Gail Ramsey, testified that she met Oliver when he was her sons' soccer coach. Ramsey became friends with Oliver's wife and the Ramseys started "hanging out" at the Olivers' house on weekends. Their families became very close. The twins often went over to the Oliver house to babysit on weekends. The twins also went on vacation with Oliver. Mrs. Ramsey trusted Oliver as a father figure with her daughters because he showed them the affection a father would show a child. Oliver was also D.P.E.'s soccer coach.
D.P.E. testified that she met Oliver in 2003, when she was in sixth grade. Their families became close. She and her sister frequently stayed overnight at Oliver's house. In the beginning, she regarded Oliver as "[a]lmost like a father figure" because he was always there, playing with them. D.P.E. trusted and confided in Oliver. In addition, Oliver was D.P.E.'s soccer coach in 2004 and 2005. D.P.E. testified that three incidents occurred between her and Oliver. All of them occurred at his house. One occurred in the living room, one somewhere inside his house, and one in the swimming pool.
D.J.E. testified that she met Oliver when her brothers started playing soccer. He was "like a father figure." D.J.E. stayed overnight at Oliver's house babysitting on a regular basis. She trusted him. She told him her father had died and he shared with her that his father had died when he was around her age. That connection made her feel close to him. D.J.E. testified to four incidents all occurring at Oliver's house. Three occurred while she was alone with Oliver in his bedroom. D.J.E. specified that on the first occasion, Oliver locked the bedroom door. The other incident occurred while she and Oliver were alone in his swimming pool.
This evidence was sufficient for the jury to conclude that Oliver was in a position of familial or custodial authority. The girls looked up to Oliver as a father figure. They trusted and confided in him. Their own father was deceased and they were *677 not close to their step-father. Thus, there was a recognizable bond of trust between Oliver and the girls similar to that of father and child.
In addition, the twins' mother trusted Oliver enough to let them stay overnight at his home and go on vacation with him. Oliver was one of the girls' soccer coaches. All of the incidents occurred at Oliver's home at times when Oliver was alone with the girls or others were asleep. Thus, Oliver was in a position of custodial authority over the girls because they frequently stayed overnight with him and were alone with him at his house when the incidents occurred.

Admission of Expert Testimony
The State called Dr. Thomas Dikel, who was accepted, without objection, as an expert in child sexual abuse, child psychology and neuropsychology. He testified that although there was "no single post sexual abuse syndrome" and "no way to look at a child and say this child's been sexually abused," there were some typical behaviors. These included (1) the victim's desire to act "hyper-normal" after being sexually abused; (2) denying sexual abuse at first; (3) delaying disclosure; (4) disclosing the facts in piecemeal fashion; and (5) the victim's attempts to control their emotions.
Oliver argues that the trial court erred in admitting Dr. Dikel's testimony, over objection, because it was improper profile evidence. He cites to Hodden v. State, 690 So.2d 573 (Fla.1997), which held that expert testimony regarding the child sexual abuse accommodation syndrome was not admissible because it had not been proven to be generally accepted in the scientific community, as required under Frye v. United States, 293 F. 1013 (D.C.Cir.1923).
However, Hodden noted that the Frye standard "is not applicable to an expert's pure opinion testimony which is based solely upon the expert's training and experience." Id. at 579-80. In this case, Dr. Dikel carefully couched his testimony solely in relation to his professional experience. Thus, it was pure opinion testimony not subject to Frye.
We also disagree with Oliver's contention that Dr. Dikel's testimony constituted improper vouching for the credibility of the victims. It is well-established that an expert may not directly testify as to the truthfulness of the victim in a child sexual abuse case. Tingle v. State, 536 So.2d 202, 205 (Fla.1988). However, Dr. Dikel did not directly testify about the victims in this case. Instead, he offered observations from his experience regarding behaviors of child sex abuse victims. These were admissible to "properly aid a jury in assessing the veracity of a victim of child sexual abuse." Id. They were also admissible to rebut defense attacks on the victims' credibility. See Russ v. State, 934 So.2d 527, 530-31 (Fla. 3d DCA 2006).

Admission of Oliver's Prior Sexual Statements in the Presence of Children
Before trial, the State filed a motion in limine to admit Oliver's prior statements regarding sexual activity. In one instance, Oliver allegedly told one of the girls on the soccer team he coached, "If your dad would get off or quit riding your momma, then maybe he'd be here on time." The girl's father later complained and Oliver was reprimanded by the soccer league. In another instance, Oliver told one of the victims that when he had sex with his girlfriend, her head would hit the headboard when she [had an orgasm] and that when he or his girlfriend Tina would [have an orgasm], they would knock the picture frame off the wall. The trial court ruled these statements were "highly inflammatory," irrelevant, and therefore inadmissible.
*678 At trial, Oliver testified on direct exam that he had coached in youth sports since he was eighteen years old, from Maryland to Florida. He was also asked about an incident of "sexual joking" that took place in front of children, in which Mrs. Ramsey put Oliver's young child on her lap and prompted her to say something. Oliver explained, "It was referring to my ex-wife at the time, Shannon, as being Mommy's a Ho, Daddy's a Ho, Daddy's a Jackass, inappropriate language for any of the children."
Based on these two statements, the prosecutor argued, at a bench conference just before Oliver's cross-examination, that Oliver had "opened the door" to questioning about statements the court had previously ruled inadmissible because Oliver had tried to portray himself as a model soccer coach and not approving of sexual talk in front of children. Defense counsel conceded that the prosecutor could ask if Oliver had been reprimanded. The court ruled that Oliver had made coaching a credibility issue. As to the extent of further questioning, the following exchange occurred:
[PROSECUTOR]: Judge, I can ask him if he made that statement. To ask him if he's ever been reprimanded means nothing.
THE COURT: You can ask him. It depends on how.
[PROSECUTOR]: Were you ever asked to apologize to one of the parents? THE COURT: If he says no, then that takes you to the next level.
On cross-examination, the following exchange occurred:
Q. Were you reprimanded by the administration of directors of the Lady Lake Soccer League for making an inappropriate sexual comment to [M.D.] on the field one day?
A. I was reprimanded for something.
Q. Do you know what that was for, sir?
A. Yes. You can be reprimanded for anything in the
soccer league. Any allegations that might come up, anything that arises.
Q. Let me refresh your recollection. [M.D.] was waiting for her mother one day from the soccer field. She's a little girl. And you told her if your dad would get off or quit riding your mama, then maybe he'd be here on time. You told that to that child, correct?
A. I don't recollect that. No, sir.
. . . .
Q. Now, did there come a time as well sometime in 2005, late 2005, that you had a conversation with [D.J.E.] and I believe her brother, [M.E.], where you were talking about having sex with your girlfriend, Tina Turner, and making her come when her head would hit the headboard and bang the picture frame? Do you recall that?
A. That conversation never took place.
Q. Okay. And in that conversation, you indicated that when she would come and you would come, you would knock the picture frame off the wall. Do you remember saying that in front of [D.J.E. and M.E.]?
A. No. That conversation never took place.
Q. Okay. Would you consider that inappropriate language for children?
A. Yes. I would.
In its rebuttal case, the State called Oliver's assistant soccer coach, Jim Gartland, who overheard Oliver tell one of his girl soccer players to "tell your mama to get off your papa and come down here and pick you up." The girl's father complained to the president of the soccer league, who confronted Oliver. At first, Oliver denied *679 making the statement, but ultimately apologized to the father, The State also recalled one of the victims, who testified that Oliver told her, in the presence of other children, that "when he was banging [his girlfriend], the picture on the wall would fall off. And also, when he made her come, she would hit the door."
The abuse of discretion standard applies to review of trial court decisions to admit evidence. Lowry v. State, 963 So.2d 321, 325 (Fla. 5th DCA 2007). Oliver argues that the prosecutor violated a pretrial order in limine by questioning him and other witnesses about two sexually related comments he allegedly made.
However, we agree with the State that Oliver "opened the door" by portraying himself on direct examination as someone who had been a model soccer coach and someone who disapproved of talking about sex in front of children. Once the door, was opened, and the trial court had revisited its prior ruling, Oliver failed to object to the prosecutor's subsequent questioning. Even if Oliver had objected, we believe the prosecutor's questions were proper. When Oliver was asked about being reprimanded for making sexually inappropriate comments, he attempted to mislead the jury by responding that he was reprimanded "for something." Consequently, the State was entitled to follow up on this question to negate any false impression created by Oliver. See, e.g., Fotopoulos v. State, 608 So.2d 784, 791 (Fla.1992).

Prosecutor's Improper Attack on Oliver's Fiancé
Oliver's fiancé, Sharon Dlugoborski, testified for the defense. During cross-examination, Dlugoborski acknowledged that at one point after Oliver went to jail, she moved in with a woman named Bebe Fox. At that point, the prosecutor asked Dlugoborski, "And you moved in with Bebe Fox because you slept in the same bed with her?" The trial court sustained Oliver's objection to the question.
Later, during Oliver's cross-examination, the prosecutor asked Oliver about his telephone conversations with Dlugoborski from jail:
Q. Did there come a time when you discussed with Sharon her bisexuality and sleeping in the same bed with Bebe Fox?
A. No. I did not discuss her 
At that point, defense counsel objected and asked that the question be stricken. At a bench conference, defense counsel requested a mistrial based upon the prosecutor's question regarding the sexual orientation of the witness. The court denied the motion, stating:
As to the issue of the motion concerning the bisexuality of any witnesses, it has been stopped at this point. And I believe by sustaining that objection, stopping and advising the State not to go any further with that, your client has not been unfairly prejudiced.
Oliver argues that the trial court erred in denying his motion for mistrial after the prosecutor improperly attempted to impugn the credibility of a key defense witness by accusing her of being a lesbian. A trial court's ruling on a motion for mistrial is reviewed for abuse of discretion. Lowry, 963 So.2d at 327. A motion for mistral should only be granted if the error is so prejudicial that it vitiates the entire trial. Id.
Here the prosecutor's attempt to cast Dlugoborski as a lesbian was clearly improper. It was both irrelevant and unfairly prejudicial. However, we believe the trial judge was in the best position to judge the detrimental impact of this attack. *680 We cannot say, based on the record before us, that the trial court abused its discretion in concluding that this error was not so prejudicial as to vitiate the entire trial.
Accordingly, we affirm Oliver's convictions.
AFFIRMED.
GRIFFIN and COHEN, JJ., concur.