780 So.2d 106 (2001)
Floyd Thomas ROBERTSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D98-2383.
District Court of Appeal of Florida, Third District.
March 28, 2001.
*107 Bennett H. Brummer, Public Defender, and Manuel Alvarez, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General, and Margaret A. Brenan, Assistant Attorney General, for appellee.
Before SCHWARTZ, C.J., and JORGENSON, COPE, LEVY, GERSTEN, GODERICH, GREEN, FLETCHER, SHEVIN, SORONDO, and RAMIREZ, JJ.

OPINION ON REHEARING EN BANC
GERSTEN, Judge.
Floyd Thomas Robertson ("defendant") appeals his conviction and sentence for second degree murder in the shooting death of his girlfriend. The defendant claims the trial court erred in allowing his ex-wife to testify concerning the defendant's previous threat to the ex-wife with a gun. Because the defendant alleged the shooting was accidental, and that he had never used a gun in a threatening manner toward anyone close to him, we conclude this evidence was properly admitted for both impeachment purposes, and relevancy *108 under Section 90.404(2)(a), Florida Statutes (1997), to show the defendant's "motive, intent, and absence of mistake." We affirm.
On September 16, 1996, victim Maria Nelson ("Maria") confided to a co-worker that she was having problems with her live-in boyfriend, the defendant. Maria was upset and nervous, and told her friend that she was going to ask the defendant to move out of her apartment that night.
Approximately three hours later, the fire rescue department received a call from the defendant, who stated that he had shot "someone." When the police arrived, the defendant led them into a bedroom where a gun was laying on the floor with the slide locked.
Victim Maria Nelson was lying on the bed semi-conscious. The police detective tore off her shirt to see if he could provide medical help. Although the defendant had a medical background as a paramedic, there was no evidence that the defendant attempted any kind of aid on Maria. Maria was airlifted to the hospital where she eventually died.
The defendant was charged with second degree murder. At trial, his theory of defense was that the gun accidentally misfired while he was taking it out of the closet to clean it.[1] The State's theory of the case was that the defendant shot Maria during a domestic argument and that the shooting was not accidental. Since the defendant was the only witness to the shooting, the critical issue for the jury to determine was whether the defendant's story was credible.
Several of Maria's neighbors testified they heard loud thuds coming from the apartment on the evening of the shooting, as though someone were being thrown against the wall. At one point, the defendant was observed going out onto the balcony and flailing his arms around as if involved in a heated discussion. The defendant then went inside the apartment and Maria came out onto the balcony. A few minutes after Maria went back into the apartment, the neighbors heard a gunshot.
The arresting detective who took the defendant's statement stated that the defendant's version of what occurred varied. At the police station, the defendant stated he and Maria had an argument that evening, but that he had never gotten physical with Maria. The defendant explained he was taking out his semi-automatic .40 caliber Ruger handgun to clean it, when his finger slipped on the trigger and he shot Maria. Later, the defendant testified that he was taking out the gun because he wanted Maria to see it. The defendant further testified his relationship with Maria was an excellent one and that they had not been fighting on the day of the shooting.
The defendant's friend, Steve Angene, testified that the defendant had called him after the shooting. In that phone call, the defendant stated he had been having a dispute with Maria, and that Maria had followed him into the bedroom. The defendant asked Steve not to tell the police about his fight with Maria.
In contrast to Steve's testimony, the defendant testified at trial that he had a happy relationship with Maria. He also testified that the gun which killed Maria was accidentally stored in a single-action cocked manner. He further stated that he was not very familiar with the gun, and that the gun accidentally fired and hit Maria.
On cross-examination, the State asked the defendant about his knowledge and training with various weapons. Without objection, the defendant was asked about his military experience, and his previous *109 use of such weapons as M-16 rifles, handguns, M60's, sporting guns, and a Russian rifle. The defense only objected when the State asked the defendant if he had ever purchased an AK-47 rifle. The State then asked if the defendant ever threatened anyone with an assault rifle. When the defendant responded he had not, the State asked if the defendant threatened anyone close to him with an AK-47. The defendant responded, "I have never threatened anybody close to me with a weapon, anybody, period, with a weapon, sir." The defendant's ex-wife was later called on rebuttal and testified the defendant had threatened her with a gun during a domestic dispute. Defense counsel had taken the ex-wife's deposition prior to trial and was well aware of the prior AK-47 rifle incident.
At the conclusion of its deliberations, the jury returned a verdict finding the defendant guilty of second degree murder. The defendant appeals his conviction and sentence to life imprisonment, claiming the trial court erred in allowing the testimony of the ex-wife regarding the prior incident.
Florida Statute Section 90.608(5), provides that once a defendant takes the stand and testifies, he or she places credibility at issue and prosecutors are allowed to impeach that credibility with "proof by other witnesses that material facts are not as testified to by the witness being impeached." See § 90.608(5), Fla. Stat. (1997); Charles W. Ehrhardt, Florida Evidence § 608.1 at 385 (1997 ed.).
Our courts have long recognized that the truth-seeking purpose of the adversary system is promoted by cross-examination which appropriately challenges the witness's credibility through eliciting testimony favorable to the cross-examining party. See Chandler v. State, 702 So.2d 186 (Fla.1997); Shere v. State, 579 So.2d 86, 90 (Fla.1991). Specifically, with regard to impeachment cross-examination, prosecutors are to be allowed "wide leeway" in order to prevent defendants from being able to "frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." See Lebowitz v. State, 343 So.2d 666, 667 (Fla. 3d DCA 1977) (quoting Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, 97 n. 7 (1976). See also, Geralds v. State, 674 So.2d 96 (Fla.1996) (cross examination not confined to identical details testified to in chief; extends to all matters that may supplement, contradict, rebut, or make clearer facts testified to in chief)).
Applying these principles to the facts of this case, it is clear the defendant placed his credibility at issue by taking the stand. After giving oath and presenting testimony to the jury, the defendant was then subject to cross-examination and potential impeachment like any witness in any case.[2]See Ivey v. State, 132 Fla. 36, *110 180 So. 368 (Fla.1938); C.M. v. State, 698 So.2d 1306 (Fla. 4th DCA 1997); Ashcraft v. State, 465 So.2d 1374 (Fla. 2d DCA 1985).
The defendant testified he never threatened anyone with a gun. Clearly this statement was intended to buttress his theory of defense and his contention that he shot Maria by mistake while "cleaning" the gun. Having testified that he had never threatened anyone with a gun, the defendant opened the door to questioning about the prior incident where he had threatened his ex-wife with a gun. See Fletcher v. State, 619 So.2d 333 (Fla. 1st DCA), review denied, 629 So.2d 132 (Fla. 1993); Hernandez v. State, 569 So.2d 857 (Fla. 2d DCA 1990). With the door open, it was then permissible for the State to impeach the defendant's statements and to show that he was not being truthful on the stand. See Allred v. State, 642 So.2d 650 (Fla. 1st DCA 1994); Lusk v. State, 531 So.2d 1377 (Fla. 2d DCA 1988). See also Howard v. State, 228 Ga.App. 775, 492 S.E.2d 683 (1997) (evidence defendant shot prior girlfriend 12 years earlier held admissible to impeach testimony regarding gun use).
We also find this evidence admissible as relevant under Section 90.404(2)(a), Florida Statutes (1997), which provides:
"Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity."
It is well established that evidence is admissible if it is relevant to prove a material fact at issue, and if it is not precluded by a specific rule of exclusion. See § 90.402(2)(a), Fla. Stat. (1997); Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 .S.Ct. 102, 4 L.Ed.2d 86 (1959).
The test for relevancy is whether such evidence "casts light upon the character of the act under investigation by showing motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of the prior offenses would have a relevant or a material bearing on some essential aspect of the offense being tried." Williams v. State, 110 So.2d at 662.
Here, the critical issue at trial was whether the defendant accidentally shot Maria. Since there were no eyewitnesses to the shooting, the credibility of the defendant and his story, were crucial to the outcome of the case.[3] The evidence that the defendant had previously threatened someone close to him during a domestic dispute with a firearm, directly related to the central issue in the casethe defendant's claim that he was "cleaning" the gun which "accidentally" discharged while arguing with Maria, as opposed to "threatening" Maria with the gun when she was shot and killed.
Because intent is often the most difficult element to prove in an unwitnessed crime where the victim is dead, evidence reflecting on the defendant's intent is clearly probative with regard to a claim of accidental *111 shooting. The former wife's testimony that the defendant threatened her with a gun during a domestic dispute tends to negate the likelihood that the shooting was accidental. We find the ex-wife's testimony was relevant in ascertaining the defendant's motive and intent with regard to the claim Maria's shooting was accidental.[4]
Having established the ex-wife's testimony was relevant, we now determine whether or not it is precluded by a specific rule of exclusion. In this regard, the trial court has broad discretion not only in determining the relevance of evidence, but also in determining whether its probative value outweighs any prejudicial effect, thereby rendering such evidence admissible. See § 90.403, Fla. Stat. (1997); Rodriguez v. State, 753 So.2d 29 (Fla.2000); Williamson v. State, 681 So.2d 688 (Fla. 1996), cert. denied, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997). Such a determination will not be disturbed on appeal absent an abuse of discretion. See Heath v. State, 648 So.2d 660 (Fla.1994). Keeping these standards in mind, we determine that the trial court did not abuse its discretion in admitting this evidence.
Section 90.404(2)(a) prohibits the introduction of similar fact evidence of other crimes, wrongs, or acts, where such evidence is relevant solely to prove bad character or to show the defendant possesses a propensity for criminal behavior. Section 90.404(2)(a) specifically allows the admissibility of similar fact evidence to prove a material fact in issue, such as "intent" and "absence of mistake or accident." Accordingly, a trial judge has the discretion to admit similar fact evidence when it is relevant as to a non-character aspect in the case.
Here, the evidence of a threat against a previous partner involving a gun had the purpose of assisting the jury to understand defendant's conduct at the time of the shooting with regard to the defendant's intent and his claim of accident. The evidence was admitted for the appropriate purpose of showing the defendant's motive and intent at the time of the shooting he claims was accidental.[5]See Smith v. State, 232 Ga.App. 290, 501 S.E.2d 523 (1998) (evidence defendant previously attacked estranged wife admissible to show intent and disprove defense of accident); State v. Grubb, 111 Ohio App.3d 277, 675 N.E.2d 1353 (1996) (former wife's testimony admissible to prove intent and lack of accident in domestic violence case where defendant claimed injuries were accidental); State v. Clark, 179 Wis.2d 484, 507 N.W.2d 172 (1993) (former girlfriend's testimony admissible to show intent and *112 rebut defendant's claim of accident). Cf. Gore v. State, 719 So.2d 1197 (Fla.1998) (evidence not admissible because sole relevance was to demonstrate bad character). We conclude this evidence was admissible pursuant to the motive and intent exceptions to the general exclusionary rule.[6]
We must next determine whether the trial court properly found that any prejudice in the admission of this evidence was outweighed by its probative value. In this regard, we note that almost all evidence to be introduced by the state in a criminal prosecution will be prejudicial to a defendant. See Amoros v. State, 531 So.2d 1256 (Fla.1988). However, even evidence which incidentally places a defendant's character in issue is admissible where substantially relevant to show some other purpose than to show propensity. See Williamson v. State, 681 So.2d at 695.
While we recognize the ex-wife's testimony was undeniably prejudicial to the defendant, it was also critically relevant in tending to establish the defendant's motive and did not lessen the prosecution's burden to prove the defendant's guilt beyond a reasonable doubt. See Summit v. State, 285 So.2d 670 (Fla. 3d DCA 1973) (evidence of similar conduct toward another person, was relevant and admissible to show character of the deed as to motive intent and absence of mistake). See also, People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995) (evidence of prior assaults probative value with regard to motive and intent outweighed potential for incidental prejudice); People v. Sims, 110 A.D.2d 214, 494 N.Y.S.2d 114 (1985) (evidence admissible to show absence of mistake; probative value outweighed potential prejudice). Thus we find the trial court properly balanced the import of this relevant evidence against the danger of prejudice, and properly determined it's probative value outweighed its prejudicial effect. See State v. Jacobs, 939 S.W.2d at 7 (probative value of evidence of violence in relationship with victim established defendant's motive and thus outweighed prejudicial effect); People v. Hines, 260 A.D.2d 646, 690 N.Y.S.2d 63, 690 N.Y.S.2d 66, (1999) (probative value of prior domestic violence evidence outweighed prejudicial effect).[7]
In conclusion, the ex-wife's testimony was properly admitted pursuant to the motive and intent exceptions to the general exclusionary rule, and also for impeachment *113 purposes.[8] The prior incident was clearly relevant, and especially probative, in rebutting the defense that Maria's shooting death was a mistake. Finding no abuse of discretion in the trial court's well-reasoned application of established evidentiary principles, we affirm the defendant's judgment and sentence for second degree murder.
Affirmed.
COPE, GODERICH and GREEN, JJ., concur.
SCHWARTZ, Chief Judge (specially concurring).
I agree with those portions of Judge Gersten's opinion which find that the defendant's prior threat was both relevant and not excluded by any pertinent rule of evidence, specifically the one established in Williams v. State, 110 So.2d 654 (Fla. 1959), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). Moreover, unlike Judge Sorondo, I do not believe that there is any procedural obstacle, by way of any cognizable prejudice to the appellant, to the consideration of this ground as a basis for decision. Without reaching, therefore, the "impeachment" issue, I concur in affirmance.
JORGENSON and LEVY, JJ., concur.
SORONDO, J. (dissenting)
I respectfully dissent. In the interest of clarity, I withdraw my concurring panel opinion and incorporate herein all aspects of my position in this case.
The majority holds that evidence of defendant's prior misconduct is admissible. Judge Gersten, joined by Judges Cope, Goderich and Green, posits that it constitutes legitimate impeachment because defendant opened the door to this area of inquiry by lying.[9] The majority of this Court holds that the evidence was nevertheless admissible under section 90.404(2)(a), Florida Statutes (1997). My analysis of these issues follows.

I. THE IMPEACHMENT ISSUE
The impeachment argument is based on section 90.608(5), Florida Statutes (1997). The statute reads as follows:
Any party, including the party calling the witness, may attack the credibility of a witness by:
. . . .
(5) Proof by other witnesses that material facts are not as testified to by the witness being impeached.
The opinion concludes that this section allows the impeachment of the defendant because he responded untruthfully to the prosecutor's question.
Judge Gersten begins his discussion of this issue at page four of his opinion. The opinion relates defendant's testimony that he was not very familiar with the handgun that fired the shot that killed the alleged *114 victim in this case. The opinion goes on to note that without objection defendant was asked "about his military experience, and his previous use of such weapons as M-16 rifles, handguns, M60's, sporting guns and a Russian rifle." Maj. op. at 108-09.[10]
There is, as defense counsel obviously realized, a significant difference between the general question of defendant's experience with firearms and the issue of defendant's experience with the AK-47 in question. Because the defense was accidental shooting, evidence of defendant's prior experience in the handling of firearms was unquestionably relevant to rebut the likelihood that such an experienced individual could be so monumentally reckless in the handling of the firearm used in the present case.[11] Defense counsel objected to the AK-47 inquiry because he obviously knew where it was going.
The opinion avoids the central issue presented by this part of its analysis by glossing over the impermissible nature of the follow-up question asked by the prosecutor, "... isn't it a fact that you have threatened people with assault rifles before?" This question is exactly the same as asking, "... isn't it a fact that you have committed aggravated assaults in the past?" Florida law is clear that such a question is forbidden, see Fulton v. State, 335 So.2d 280 (Fla.1976); Watson v. Campbell, 55 So.2d 540, 541 (Fla.1951) ("[E]vidence of particular acts of misconduct cannot be introduced to impeach the credibility of a witness."), unless the defendant preliminarily opens the door to that area of inquiry by placing his character at issue, by purposely giving misleading or untruthful testimony during his direct examination, or by doing so in an unsolicited manner during cross-examination. See Bozeman v. State, 698 So.2d 629 (Fla. 4th DCA 1997).[12]
*115 The defendant did not place his character at issue during his direct-examination. Nor did he place it at issue by gratuitously volunteering favorable information during cross-examination. He, therefore, did not "open the door" to the alleged prior crime introduced against him. Accordingly, the sole and extremely narrow issue remaining, is whether the state can, by asking a blatantly improper question on cross-examination, open the door to otherwise inadmissible character evidence under the guise of impeachment or rebuttal. The answer is a resounding and inescapable, no.
Ironically, one of the cases cited as an example for Florida to follow, as concerns the Williams rule issue, specifically rejected the proposed impeachment argument. See State v. Grubb, 111 Ohio App.3d 277, 675 N.E.2d 1353 (1996). There, the state argued that the defendant's testimony that he was a peaceful person opened the door to the introduction of two incidents where the defendant assaulted his former wife during their marriage. The Court stated:
Defendant did not testify on direct examination that he is a peaceful person or that he has never assaulted any woman, including his former wife. Rather, it was the state that elicited that testimony from defendant on cross-examination by the use of specific questions designed for just that purpose. The defense objected, unsuccessfully, to that questioning. Because defendant made no claim at trial regarding his own good character, i.e., did not put his character in issue, the testimony of defendant's former wife, ..., was not admissible ... to rebut same. The prosecution cannot circumvent the limited nature of the exception provided in [the rule] by putting the character of an accused in issue via its own questions, and then present evidence to rebut the answers.
Id. at 1355 (citations omitted). Although the Court ultimately allowed the introduction of the other crime evidence, it did so on other grounds and not because the defendant had placed his character at issue. Id. at 1356.[13]
Florida has embraced the same reasoning. In Bozeman v. State, 698 So.2d 629 (Fla. 4th DCA 1997), the Court stated:
To open the door to evidence of prior bad acts, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled.... The "opening the door" concept is based on considerations of fairness and the truth-seeking function of a trial, where cross-examination reveals the whole story of a transaction only partly explained in direct-examination.

Id. at 630-31 (emphasis added). See McCrae v. State, 395 So.2d 1145 (Fla.1980) (where defense counsel's questioning communicated the erroneous impression that defendant's prior convictions were inconsequential, the state was properly permitted to elicit the nature of the defendant's prior felony conviction on cross-examination); Allred v. State, 642 So.2d 650 (Fla. 1st DCA 1994) (by testifying that he lacked a violent propensity and asserting that he had never hit a woman, defendant opened the door to rebuttal evidence that he had previously physically assaulted his former wife and a girlfriend); Fletcher v. State, *116 619 So.2d 333 (Fla. 1st DCA 1993) (where defendant testified during his direct examination that he had never pointed a gun at anybody and that he was a responsible user of firearms, the state was properly allowed to introduce evidence of an episode wherein the defendant used a firearm recklessly); Brown v. State, 579 So.2d 898 (Fla. 4th DCA 1991) (where defendant tried to enhance his credibility by telling the jury that he had been a law enforcement officer, the trial court properly allowed the state to bring out on cross-examination that defendant had been fired from his job as a corrections officer); Hernandez v. State, 569 So.2d 857 (Fla. 2d DCA 1990) (where, during cross-examination, defendant volunteered statements that he had never done any drug-related deals in his life, he opened the door to questioning about a heroin deal he had arranged two days prior to the instant offenses); Dodson v. State, 356 So.2d 878, 879 (Fla. 3d DCA 1978) (where questions on direct examination of defendant created a basis for inference that there was one prior conviction for auto theft and that there were other crimes, i.e., crimes other than theft, the state was properly allowed to clarify on cross-examination that the "other crimes included auto theft and theft of other properties"); Davis v. State, 216 So.2d 87 (Fla. 2d DCA 1968) (The trial court did not err in allowing the state to cross-examine defendant about charges of exhibiting a dangerous weapon where, on direct examination, defendant had repeatedly asserted that he never possessed firearms of any nature since moving to Sarasota).
Based on the cases set forth above, I conclude, as did then Judge, now Justice Barbara Pariente in her concurring opinion in DeFreitas v. State, 701 So.2d 593, 605 (Fla. 4th DCA 1997), that "it is ... difficult to understand how the state can claim that defendant opened the door when it was the prosecutor who asked the series of impermissible questions concerning prior acts of misconduct on cross-examination."[14]
In support of his position to the contrary, Judge Gersten relies on Fletcher v. State, 619 So.2d 333 (Fla. 1st DCA 1993), and Hernandez v. State, 569 So.2d 857 (Fla. 2d DCA 1990). Neither case supports the legal conclusion for which it is cited.[15]
*117 In Fletcher, defendant testified during direct examination that he had never pointed a gun at anyone and that he was a responsible user of firearms. In response to this assertion, the state questioned defendant about another incident during which he had displayed a gun tucked in his waist. He denied it. The state then recalled the victim of the charged offense who testified that defendant had displayed a firearm in the presence of the victim and another person on an occasion prior to the commission of the charged offenses.
The First District Court of Appeal correctly held that defendant had opened the door to the introduction of the prior incident. Fletcher, 619 So.2d at 334. Fletcher is distinguishable from the present case in that the door to the otherwise impermissible evidence of prior bad acts was opened by the defendant during direct examination.
In Hernandez, the defendant was charged with trafficking in cocaine and conspiracy to traffic in cocaine. The charges arose from a sting operation where a police informant arranged a cocaine purchase between the defendant and undercover detectives. At trial, the defendant testified that he believed he was working with police to set up his "Colombian connection" at the time he was arrested. During cross-examination, the defendant volunteered that he had never done any drug-related deals in his life. In response to this unsolicited, self-serving and false statement the state was correctly allowed to ask the defendant about a heroin deal he arranged between the informant and a third person two days prior to the charged offenses. Hernandez, 569 So.2d at 859.
A second issue in Hernandez involved the defendant's testimony on cross-examination that he had not intentionally done anything during the events leading to the charged offense that would have indicated to police that he was not working for them. In response to this assertion, the state was allowed to ask the defendant whether he had made a statement suggesting that he had just "shot up" drugs in another room. He denied that he had.
The state then recalled the undercover officers who testified that at one point during the undercover drug transaction, the defendant had entered the bathroom and upon exiting made a statement to the effect that he had just "shot up."
The Second District Court of Appeal held that the statement was admissible to rebut the defense since "a person who believed that he was in the presence of police detectives generally would not state that he had just shot up illegal drugs." Hernandez, 569 So.2d at 859.
*118 The second issue in Hernandez is distinguishable from the case at bar in that there is no indication that the question posited by the prosecutor in cross-examination in Hernandez, which elicited the defendant's false statement, was an impermissible question. Additionally, the "shooting up" incident occurred contemporaneously with the charged offense and was arguably inextricably intertwined therewith.
I do not challenge the general proposition that evidence of a prior crime may be admissible when it is relevant to rebut a criminal defendant's untruthful testimony. I do, however, reject the suggestion that the prosecution can open the door to otherwise inadmissible evidence by securing an impeachable response from the accused by way of an impermissible question.

II. THE WILLIAMS RULE ISSUE
The majority's conclusion that the evidence was admissible under the Williams rule is incorrect.

A. Inapplicability of the Tipsy Coachman Doctrine.
It should be understood that the Williams rule arguments contained in the majority's opinion were never presented to or considered by the trial judge. The majority considers the Williams rule issue on the basis of the so-called "tipsy coachman" doctrine, which holds that "[i]n some circumstances, even though a trial court's ruling is based on improper reasoning, the ruling will be upheld if there is any theory or principle of law in the record which would support the ruling." Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla.1999); see also Carraway v. Armour & Co., 156 So.2d 494 (Fla. 1963); Lowery v. State, 766 So.2d 417 (Fla. 4th DCA 2000). For the following reasons, this analysis is inappropriate in this case.
The state never filed a notice of intent to rely on evidence of defendant's prior misconduct in this case. Consequently, the admissibility of the evidence in question was never litigated within the parameters of section 90.404(2)(a), Florida Statutes (1997). Because the matter was not at issue, defendant did not have an opportunity to present evidence or arguments against the admissibility of this evidence under the Williams rule. In State, Dept. of Revenue ex rel. Rochell v. Morris, 736 So.2d 41, 42 (Fla. 1st DCA 1999), the First District Court of Appeal stated that "[f]or the appellee to argue affirmance based upon the application of this so-called `tipsy coachman' rule, ..., the appellee's argument on appeal must be supported by evidence in the record." The Court went on to conclude that there was an insufficient evidentiary basis in the record to permit such a determination. Id. The same situation exists in the present case.
This case is distinguishable from cases where the state files its notice of intent to rely on evidence of other crimes and the issue of admissibility is thoroughly litigated by both sides. In such cases, if the trial court were to exclude the state's Williams rule evidence and subsequently erroneously admit it on other grounds, the appellate court would be in a position to review the record and make a determination that although the trial judge was wrong to admit the evidence for the grounds stated, it should never have excluded the same under a Williams rule analysis. In the present case, defendant was never heard on the Williams rule issue because it was never raised. He never received an opportunity to present evidence or make argument as to why the incident involving his ex-wife should not have been admitted under the Williams rule.[16] Two possibly meritorious arguments *119 are apparent on the face of the record.
In order for defendant's prior crimes to be admissible, the trial court must be persuaded by clear and convincing evidence that such crimes were, in fact, committed. See State v. Norris, 168 So.2d 541, 543 (Fla.1964); Audano v. State, 641 So.2d 1356, 1358-59 (Fla. 2d DCA 1994); Chapman v. State, 417 So.2d 1028, 1031 (Fla. 3d DCA 1982). In order to establish the alleged prior crime, the state presented only the testimony of defendant's ex-wife. There was absolutely no corroboration of her testimony. She did not report defendant's alleged misconduct to the police at the time of the alleged offense, and no investigation was ever conducted. There is absolutely no indication in this record that the trial judge was aware that she needed to make a credibility assessment and the additional determination that the prior crime was established by clear and convincing evidence by the ex-wife's testimony.
The other issue that is potentially meritorious is the temporal remoteness of the alleged collateral crime in this case. Because appellate review of Williams rule issues is extremely fact intensive, the resulting case law is often less than a model of uniformity. Florida's appellate courts have addressed the question of when a collateral crime is too remote on several occasions. These cases are consistent only in their inconsistency. See McGough v. State, 302 So.2d 751 (Fla.1974) (collateral crime committed four years earlier was too remote); Gluck v. State, 62 So.2d 71 (Fla. 1952) (collateral crime committed three or four years before crime charged was too remote); Farnell v. State, 214 So.2d 753 (Fla. 2d DCA 1968) (collateral crimes committed eleven and twelve years earlier were too remote). But see State v. Statewright, 300 So.2d 674 (Fla.1974) (collateral crimes that occurred five years prior to crime charged were not too remote); Duffey v. State, 741 So.2d 1192 (Fla. 4th DCA 1999) (collateral crimes which occurred twelve years prior to charged offense not too remote); Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982) (collateral crimes committed five to six years after the charged offenses were not too remote); Watkins v. State, 363 So.2d 575 (Fla. 3d DCA 1978) (testimony related to a common scheme or plan some six years before the charged offense was not too remote); Crosby v. State, 237 So.2d 286 (Fla. 2d DCA 1970) (offenses occurring four years prior to the offense charged were not too remote). In most instances, these cases offer little analysis on the issue.
In Duffey, the Fourth District Court of Appeal explained that "[u]nder section 90.404(2)(a) the remoteness of a prior crime is one aspect of its relevance, its tendency to prove or disprove a material fact in issue." 741 So.2d at 1197. In Heuring v. State, 513 So.2d 122 (Fla.1987), the Florida Supreme Court stated that when faced with the claim that prior crimes are too remote to be relevant, the trial court
must consider not the passage of time alone, but the effect of the passage of time on the evidence. Remoteness in terms of the passage of time precludes the use of evidence that has become unverifiable through loss of memory, unavailability of witnesses and the like.
Id. at 123 (quoting Heuring v. State, 495 So.2d 893, 894 (Fla. 1st DCA 1986), vacated on other grounds, 513 So.2d 122 (Fla. 1987)). In addition, the trial court should take into account that the "absence of similar *120 conduct for an extensive period of time might suggest that the conduct is no longer characteristic of the defendant." Id. at 124.
In the present case, the record simply does not permit a full examination of the factors necessary to determine whether defendant's prior misconduct is too remote to be relevant. Assuming for the sake of argument that the introduction of a prior threat of violence against a different victim is admissible at all, it would be reasonable and relevant to explore whether there were any domestic relationships between defendant's previous marriage and his marriage to the victim in this case. The existence of intervening relationships without any threats of violence would certainly raise the possibility considered by the Supreme Court in Heuring that the prior misconduct "is no longer characteristic of the defendant." Id. As I have already mentioned, defendant did not have the opportunity to explore this or any other potential argument on this issue. In short, the present record does not allow for an affirmance based on the Tipsy Coachman doctrine.

B. The Inadmissibility of the Evidence under the Williams Rule.
The majority takes the position that the evidence in question here was admissible under section 90.404(2)(a). I strongly disagree.
Preliminarily, it is important to emphasize that the Williams rule evidence in this case involves a prior bad act or crime allegedly committed by the defendant against someone other than the victim in the charged offense. The analysis that follows does not apply to cases where the accused's prior misconduct was directed against the same victim as in the charged offense. It appears that most courts, for good reason, are far more likely to admit collateral crime evidence such as that in this case, when such prior crime(s) was committed against the victim in the charged offense.[17]
In support of its position, the majority cites a total of twelve out-of-state cases. Five of those cases, People v. Henson, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (1973), People v. Hines, 260 A.D.2d 646, 690 N.Y.S.2d 66 (1999), People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995), State v. Jacobs, 939 S.W.2d 7 (Mo. Ct.App.1997), and State v. Smith, 868 S.W.2d 561 (Tenn.1993), are not applicable to the present analysis because they deal with instances where the defendant's prior misconduct was directed towards the same victim as in the charged offense.
Six of the cases cited, Smith v. State, 232 Ga.App. 290, 501 S.E.2d 523 (1998), Howard v. State, 228 Ga.App. 775, 492 S.E.2d 683 (1997), Wetta v. State, 217 Ga. App. 128, 456 S.E.2d 696 (1995), People v. Sims, 110 A.D.2d 214, 494 N.Y.S.2d 114 (1985), State v. Grubb, 111 Ohio App.3d 277, 675 N.E.2d 1353 (1996), and State v. Clark, 179 Wis.2d 484, 507 N.W.2d 172 (1993), are distinguishable in that they involve factual scenarios that are different than the one in the present case. Although the collateral crimes in these cases involved victims other than the one in the charged offense, in all six cases the defendants were charged with completed crimes of violence and the collateral crimes were also completed crimes of violence.
The last case, People v. Davis, 216 A.D.2d 485, 628 N.Y.S.2d 742 (1995), is a fact scant opinion that was decided on the grounds that the appellant did not properly preserve his claims of error. The discussion *121 of the collateral crimes involved in that case is therefore dicta.
There are, however, out-of-state cases that are more closely applicable to the present analysis. In Knick v. Commonwealth, 15 Va.App. 103, 421 S.E.2d 479 (1992), a case that is virtually identical to the present one, the defendant, a deputy sheriff, was convicted of second degree murder in the shooting death of his wife. Defendant claimed that in an effort to frighten her, he pointed his service revolver at his wife. He testified that she pushed herself up from the floor where she was sitting and grabbed the barrel of the gun. Her actions, he testified, caused him to fall forward and the gun accidentally discharged and killed her.
In its rebuttal case, the prosecution introduced evidence that the defendant had, on two occasions, assaulted his ex-wife by pulling his service revolver, pointing it at her head and threatening to kill her.
The Court reversed the defendant's conviction saying:
We hold that the trial court erred in admitting this evidence because it did not tend to disprove defendant's contention that he accidentally discharged the firearm. It merely showed that the accused was guilty of prior bad acts and that he was disposed to commit an offense similar to that charged.
Knick, 421 S.E.2d at 480. I agree with this decision and similarly believe that the sole purpose served by the evidence at issue here was to establish that the defendant had a propensity to commit violent crimes with firearmsa clearly impermissible purpose. I therefore conclude that evidence of the defendant's prior misconduct against his former wife was not admissible in this case under section 90.404(2)(a), either in the state's case-in-chief or as impeachment or rebuttal under section 90.404(2)(b).
I am concerned about the far-reaching consequences of the majority's opinion. The Court holds that in a case where the accused is charged with a completed substantive violent offense and defends by raising the defense of accident, evidence of a prior incident involving a threat of violence directed to a person other than the victim in the charged offense is admissible to prove motive, intent or absence of mistake or accident.
The defendant in this case was charged with the completed, violent offense of second degree murder. The prior, alleged misconduct was an offense that threatened violence. Although such a prior threat against the victim in this case, if not too remote, may have been admissible to show intent and the absence of mistake or accident, the same cannot be said of a threat against another. Reducing these events to their simplest and most common formif the defendant had been charged with aggravated battery by punching his wife in the nose and breaking it, and he defended by claiming that he accidentally struck her while flailing his arms during an argument, under the majority's reasoning, evidence that the defendant had threatened to punch a former wife in the nose six years earlier would be admissible to rebut his claim of accident.[18]/[19] As morally satisfying *122 as this type of evidence may be, in my judgment, such evidence serves only to establish defendant's propensity to commit violent crimes.
My concerns in this regard have been considered and addressed in other cases. In Hoes v. State, 35 Md.App. 61, 368 A.2d 1080 (Sp. App. 1977), the defendant was charged with assault with intent to maim by shooting his common-law wife. The state sought to rebut defendant's defense of accidental shooting by introducing evidence that five years earlier he had shot the same woman. The trial court allowed the introduction of the prior incident. The appellate court affirmed and reasoned:
The relevance of the prior conduct rests upon two things: the similarity of the method of assault and the fact that it was upon the same victim. That he had shot her before in like manner is inferentially relevant to his intent to do so this time, especially in light of his admission that he had discharged the firearm. As the state pointed out, the fact that appellant had shot [his common-law wife] a few years earlier makes it less likely that shooting her this time was an accident or mistake. Had the prior assault been directed toward another victim, it would have had little or no relevance in evaluating his intent towards [his common-law wife]. Indeed, such an inference of intent to do that which was done would be greater the more often it had occurred, in like manner and to the same person. The similarity of nature and victim creates the relevant interrelationship.

Id. at 1085 (footnote omitted) (emphasis added).
In Johnson v. State, 655 N.E.2d 502 (Ind.1995), the accused was charged with murder when he shot a man who came to his door trying to collect money from customers of his children's newspaper routes. The prosecution sought to introduce evidence that approximately two months prior to the homicide, two people from the management of the accused's apartment complex visited his apartment in order to check the fire extinguishers therein. When they received no response at the door, they tried to use their passkey to open the door. They discovered that the accused was inside and was pointing a gun at them while threatening to shoot them if they entered. After a brief conversation, the defendant allowed them to enter the apartment and check the fire extinguishers. In its discussion of the issue of admissibility of the prior bad act, the Indiana Supreme Court stated:
We do not see how evidence of an incident in which the defendant confronted people other than and unrelated to the victim in this case and in which a shooting did not occur makes it more likely either that Johnson knew that he was killing the victim or that the shooting was not an accident.
Id. at 505 (emphasis added).
Even when dealing with a previous incident involving the same victim, some courts have held prior misconduct such as that in the present case to be inadmissible. In Walker v. State, 997 P.2d 803 (Nev. 2000), the defendant killed her husband, Anthony, and was charged with first degree murder. The defendant confessed to killing Anthony but told police that he had beaten her on the night of his death. She said that during the course of an ongoing argument she picked up a flare gun that was capable of firing shotgun shells and told Anthony to leave. When he moved in her direction she fired the gun, killing him. She further told police that she did not know she had pulled the trigger.
During trial, the state introduced evidence of two incidents where the defendant had threatened to kill Anthony. The first happened approximately ten years before the killing in the charged offense. While at a picnic, the defendant slapped *123 her son for not eating all of his food. Anthony was angered by her treatment of their son. The defendant responded by retrieving a gun from their truck, pointing it at Anthony and threatening to kill him.
The second instance of prior misconduct occurred six years before the charged offense, and involved Anthony's disciplining of the defendant's youngest son. The defendant became angry and pointed a rifle at Anthony, threatening that she would shoot if he came any closer and that she wanted money to give to her kids.
The Nevada Supreme Court explained its reversal of the defendant's conviction as follows:
First, in evaluating the relevance of prior bad acts to the crime charged, we have consistently noted that events remote in time from the charged incident have less relevance in proving later intent. We conclude that the events here, which are six and ten years old, are clearly remote in time, and thus are less relevant to [defendant's] intent at the time she shot [her husband].
Further, although the prior bad acts involve similar conduct towards the eventual victim in this case, we conclude that there is a crucial distinction between [defendant's] prior conduct and the charged conduct. Namely, [defendant's] prior acts do not involved [sic] the firing or attempted firing of the weapon at [her husband]. Importantly, [defendant] was tried for first-degree murder, a specific intent crime requiring, in addition to premeditation and deliberation, willful action that we have said requires an intent to kill. Therefore, because the prior bad acts offered here do not clearly establish an intent to kill, but more accurately show an intent to threaten, the logical relevance of the acts to show [defendant's] later intent is further diminished.

Id. at 806-07 (emphasis added). See also State v. Williams, 427 N.W.2d 469 (Iowa 1988).
The evidence at issue here is, of course, probative. I confess that I have often resorted to propensity reasoning when evaluating individuals on personal matters. These individuals, however, were not on trial for their freedom.[20] As Judge Chris Altenbernd stated in his concurring opinion in Farrill v. State, 759 So.2d 696, 703 (Fla. 2d DCA 2000), "[o]ur human willingness to use propensity logic is what makes Williams rule evidence both useful and dangerous."[21] Regardless of our natural instincts to use propensity reasoning, the law is clear to the point of needing no citation of authority that evidence of prior crimes is not admissible to establish a criminal defendant's propensity to commit crimes.
Had defendant previously threatened the victim in this case with death or great bodily harm, such a prior threat, if not too remote, would certainly be relevant to establish his intent to hurt her and thereby serve to rebut his defense of accident. This, however, is different than the present scenario. The introduction of a threat *124 made against a former wife six years earlier sheds no light on the issue of whether or not the present killing occurred as the result of an accident. Defendant did not "accidentally" discharge the gun he pointed at his ex-wife. Had the present case been the second "accidental" shooting of this nature, the existence of a previous such accident would reasonably give rise to the inference that neither incident was, in fact, "accidental." The introduction of the previous threat of violence toward a different victim, however, serves only to establish that defendant has a propensity towards violencea clearly improper purpose.
For the reasons set forth above, I would reverse.
FLETCHER, SHEVIN and RAMIREZ, JJ., concur.
NOTES
[1] The detective at the scene testified that he did not find any cleaning materials, and that the trigger had to be pulled in order for the gun to fire. The medical examiner testified that the defendant's story to the police that the gun accidentally discharged, was not consistent with the angle of the bullet's path or the angle of the bed.
[2] The dissent suggests it is permissible for a fabulist defendant to lie on the stand regarding facts especially probative to his theory of defense, so long as the lie occurs during cross-examination. We disagree. Although the dissent correctly notes the State may not ask "impermissible" questions during cross-examination to elicit otherwise inadmissible evidence not testified to on direct, see DeFreitas v. State, 701 So.2d 593 (Fla. 4th DCA 1997), the fatal flaw in the dissent's reasoning is that the question in the present case was not "impermissible." Thus the cases cited to by the dissent are unavailing.

Our Florida Supreme Court has long held that "cross examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut, or make clearer the facts testified to in chief." Geralds v. State, 674 So.2d 96, 99 (Fla.1996) (quoting Coco v. State, 62 So.2d 892, 895 (Fla.1953)); Coxwell v. State, 361 So.2d 148, 151 (Fla.1978) (same).
Here, the issue of the defendant's gun use and whether or not his use of the gun was "accidental", were matters clearly raised during his case in chief. The prosecutor was permitted to ask the question regarding gun use, because it directly related to clarify facts raised on direct, and to contradict the defendant's statements regarding his familiarity with the gun, and his claim the gun fired accidentally in causing Maria's death. Thus, applying well established Florida Supreme Court precedent, see Geralds v. State, 674 So.2d at 99, the follow-up questioning during cross was clearly not "impermissible." See also Charles W. Ehrhardt, Florida Evidence § 608.1 at 385 (1997 ed.) ("Regardless of the subject matter of the witness' testimony, a party on cross-examination may inquire into matters that affect the truthfulness of the witness' testimony.") A finding to the contrary would be tantamount to condoning perjury and adverse to the truth-seeking function of trial.
[3] Significantly, the defendant testified during direct examination that the semi-automatic murder weapon was "accidentally" in a single-action mode (cocked and loaded). Thus the defendant raised the issue of intent when he testified that he "accidentally" stored the semi-automatic in a "cocked" position and that Maria was shot because his finger slipped on the trigger as he was removing the weapon from a closet.
[4] The prior incident admitted into evidence through the ex-wife's impeachment testimony involved significant similarities to the facts of this case. In both incidents, the defendant chose to use a semi-automatic weapon, which requires the weapon to be cocked with safety off and loaded in order to be fired. Both incidents involved a woman with whom the defendant was having an intimate relationship. Both incidents involved acts of violence taking place in a relationship context and circumstances involving domestic disputes.
[5] The case of State v. Grubb, 111 Ohio App.3d 277, 675 N.E.2d 1353 (1996) is particularly instructive with regard to this critical fact. The defendant in Grubb claimed self-defense, and testified that his wife's injuries were "accidental." On rebuttal, the state introduced testimony of a former wife who stated the defendant had assaulted her during their marriage. The court held the former wife's testimony was admissible with respect to the issues of intent and lack of accident stating:

[The] defendant not only asserted a claim of self-defense but his testimony also raised an issue regarding whether his wife's injuries were "accidental" and not the result of any intentional (or knowing) conduct on his part. To that extent "intent" and "lack of accident," two matters specifically identified in Evid.R. 404(B), were in issue in this case. Accordingly, the state was entitled to utilize the evidence regarding defendant's assaults on his former wife pursuant to Evid.R. 404(B) not for the purpose of showing that on this occasion defendant acted in conformity with that character, but to prove his intent (culpable mental state) and the lack of accident, in this case.
State v. Grubb, 675 N.E.2d at 1356.
[6] Many states allow prior misconduct evidence in cases involving domestic violence as probative of intent, to rebut allegations by the defendant that the injuries suffered by the victim were the result of a mistake. See e.g., Wetta v. State, 217 Ga.App. 128, 456 S.E.2d 696 (1995) (testimony by defendant's prior girlfriend that he abused her as well was admissible to show defendant's state of mind in battery case); State v. Jacobs, 939 S.W.2d 7 (Mo.Ct.App.1997) (evidence of prior domestic abuse admissible to show intent and motive); People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995) (allowing testimony by children in murder case who witnessed the defendants' prior assaults on their mother to show motive, intent, and that murder was continuation of pattern rather than merely product of self defense); State v. Smith, 868 S.W.2d 561 (Tenn.1993) (evidence of two prior unconvicted charges for assault were relevant and admissible to establish motive for murderevidence of old threats relevant to show malice, premeditation and defendant's state of mind). These cases reveal numerous states have departed from the traditional hesitancy to admit similar fact evidence in recognition of the significant probative value such evidence has under these unique circumstances.
[7] We note that some states have enacted specific evidentiary rules to allow evidence of prior domestic violence acts by the accused to be admitted in domestic violence cases. See Cal. Stat. § 1109 (2000), Col. Stat. § 18-6-801.5 (1999), Alaska R. Evid. 404(b)(4), Minn. Stat. § 634.20 (1998). The significance of these statutes from an evidentiary standpoint is profound. Oftentimes the outcome of a domestic violence prosecution cannot rest upon the credibility of the victim who either recants, fails to appear, or, as in the present case, is dead. The introduction of prior domestic violence acts of the defendant thus becomes critical. Such evidence often means the difference between conviction and acquittal.
[8] Other state courts have recognized that evidence of prior bad acts is especially probative in overcoming a defense based upon mistake in domestic violence cases. See Smith v. State, 232 Ga.App. 290, 501 S.E.2d 523 (1998); People v. Davis, 216 A.D.2d 485, 628 N.Y.S.2d 742, 743 (1995); People v. Henson, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (1973). As explained by one court:

In cases of domestic violence, prior incidents of abuse against family members or sexual partners are more generally permitted because there is a logical connection between violent acts against two different persons with whom the accused had a similar emotional or intimate attachment. A prior act can show the accused's attitude or mindset (i.e., his bent of mind) as to how children or sexual partners should be treated or "disciplined." A prior act can also show his actual course of conduct in reacting to disappointment or anger in such a relationship, evidencing a pattern.
Smith v. State, 501 S.E.2d at 527, 528 (footnotes omitted).
[9] This argument has obviously not secured the approval of a majority of the judges of this Court and is therefore not the holding of this case. Nevertheless, I address the issue in the event the Florida Supreme Court decides to grant discretionary review.
[10] Judge Gersten then points out that the only objection involved mention of the AK-47 rifle. This can be interpreted to suggest that these issues were not properly preserved for appellate review. The opinion correctly indicates that defendant did not object to questions dealing with his prior experience with firearms. However, he did object, and properly preserved, the issue under consideration here. The exact exchange follows:

Q. [State]: In fact, you are familiar with large assault rifles, weren't (sic) you?
A. [Defendant]: Several models, yes sir.
Q. [State]: In fact, you purchased an AK 47, didn't you?
[Defense Counsel]: Objection, Judge ...
[Court]: Overruled.
Q. [State]: Isn't that correct, Mr. Robertson?
A. [Defendant]: Yes, right after Hurricane Andrew I did.
Q. [State]: And in fact, isn't it a fact that you have threatened people with assault rifles before?
[Defense Counsel]: Objection, Your Honor
. . .
[Court]: Overruled. You can answer "yes" or "no", sir.
A. [Defendant]: No.
Q. [State]: You have never threatened anyone close to you with an AK-47, Mr. Robertson?
A. [Defendant]: I have never threatened anybody close to me with a weapon, anybody period, with a weapon, sir.
(Emphasis added). Accordingly, defendant recorded his objection to the prosecutor's question and properly preserved the issue of the impropriety of the question for appellate review.
[11] It is important to note that the prosecutor's question about defendant's prior experience with firearms does not raise the issue of any prior bad act committed by defendant. Possession and knowledge of firearms is not a crime. There was no suggestion of impropriety in defendant's acquaintance with guns, particularly where the nature of the inquiry implied that defendant's experience with firearms was obtained in the military.
[12] Judge Gersten's direct response to this opinion is contained in footnote 2 of his opinion, where the claim is again made that the prosecutor's question was permissible. I still do not know what facts raised during defendant's direct examination were clarified by the prosecutor's question, nor can I agree that the question served "to contradict the defendant's statements regarding his familiarity with the gun, and his claim [that] the gun fired accidentally in causing Maria's death." As discussed herein, the prosecutor asked thorough, permissible, questions concerning defendant's experience with firearms. These questions legitimately served to rebut defendant's claim that he inadvertently mishandled the gun that killed the victim so that it discharged accidentally. This was done without attacking defendant's character. The question at issue here, however, was totally impermissible and a direct attack on defendant's character.

Moreover, the defendant did not say on direct-examination that he was unfamiliar with firearms, he said that he was unfamiliar with the handgun that killed the victima Ruger .40 caliber revolver. I fail to see how his alleged threat to his former wife with an AK-47 assault rifle serves to rebut his claim of inexperience with the revolver in question.
[13] As explained below, the facts of Grubb were different than those in the present case. In Grubb, the accused was charged with a completed crime of violence and the prior bad act also involved a completed crime of violence and not just a threat.
[14] Section 90.404(2)(b), Florida Statutes (1997), requires that the state provide the defense with notice of intent to rely on similar fact evidence of other crimes, wrongs or acts, ten days before trial. The state provided no such notice in this case. A fact which, given the state's usual aggressive pursuit of this type of evidence, suggests that it did not believe the evidence in question was admissible under the rule. It is therefore clear that the state did not intend to introduce this evidence to prove intent or absence of mistake or accident during its case in chief. In my view, the only reason why the state listed the witness was in anticipation that defendant might inadvertently open the door to such evidence. Because defendant did not, the state smashed the door open itself during cross-examination and proceeded to introduce the evidence.
[15] Judge Gersten's reliance on C.M. v. State, 698 So.2d 1306 (Fla. 4th DCA 1997), and Ashcraft v. State, 465 So.2d 1374 (Fla. 2d DCA 1985), is also misplaced. These cases are clearly distinguishable from the present case. In C.M., the arresting officer testified that after she spoke to the victim and received a description of the defendant she found defendant approximately three blocks away. She further testified that when defendant saw her police car, he ran.

C.M. testified that he ran from the police because he thought he was being sought by them for skipping school. On cross-examination the prosecutor asked him whether he had seen any officers earlier that day. C.M. stated that he had not.
On rebuttal, the arresting officer testified that she had seen C.M. earlier the same day and actually had contact with him. At that earlier time, C.M. did not flee when approached by the police.
The defense objection in C.M. was that the officer's rebuttal testimony constituted impermissible impeachment on a collateral matter. The objection was overruled and the trial court accepted the state's argument that the rebuttal testimony went to the defendant's truthfulness and also to discredit his explanation for fleeing when he saw the police. The appellate court affirmed, holding that "C.M.'s flight was a `material fact' within the meaning of section 90.608(5), because it was circumstantial evidence that he attempted to rob the victim ..." C.M., 698 So.2d at 1307.
C.M. is distinguishable from the present case in that it does not involve impeachment with the use of character evidence. This alone makes it totally irrelevant to the present analysis. Additionally, C.M. explained on direct examination his reason for fleeing from the police. It was therefore perfectly permissible for the state to pursue that line of questioning in cross-examination. Finally, the state's question on cross-examination was not an improper question on a generally forbidden subject as was the question in the present case.
In Ashcraft, the state introduced evidence of the specific nature of the defendant's prior conviction, rape. It argued that the defendant opened the door to this evidence by testifying that he had never hurt anyone. The Second District Court of Appeal characterized what happened in the lower court as follows:
In his testimony on direct examination defendant undertook to relate to the jury what occurred on the date of the crimes for which he was on trial but digressed and referred to prior crimes. In doing so defendant misled the jury by saying that he had never hurt anyone during those prior crimes.
Ashcraft, 465 So.2d at 1375 (emphasis added). The Court went on to affirm the defendant's conviction. Although this case did involve character evidence, the state was allowed to impeach the defendant in a manner that would ordinarily be impermissible because the defendant opened the door to such questioning during his direct-examination. I further note that Ashcraft does not rely upon or even mention section 90.608(5).
[16] Along this line, I note that defendant was totally unprepared to defend against the ex-wife's testimony. Although she had been listed as a witness and deposed by defense counsel, her testimony was obviously inadmissible in the absence of a notice of intent to rely on evidence of other crimes or defendant somehow opening the door to her testimony. Since the state had not given the required notice, by avoiding the dreaded "door," defense counsel did not have to prepare a defense to her testimony. When the ex-wife was nevertheless allowed to testify to an event she alleged happened but did not report to the police or anyone else, defense counsel was left without any way to challenge her testimony. His only question to her concerned the reason for her divorce from defendant. She explained that she left the defendant when she caught him in their marital bed with another woman.
[17] See generally Gattis v. State, 637 A.2d 808 (Del.1994); People v. Illgen, 145 Ill.2d 353, 164 Ill.Dec. 599, 583 N.E.2d 515 (1991); State v. Williams, 672 So.2d 1150 (La.Ct.App. 1996); State v. Danikas, 11 S.W.3d 782 (Mo. Ct.App.1999); People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995); People v. Johnson, 213 A.D.2d 675, 624 N.Y.S.2d 206 (1995); State v. Smith, 868 S.W.2d 561 (Tenn. 1993); Abbott v. Commonwealth, 2000 WL 29992 (Va.Ct.App. Jan.18, 2000).
[18] Without belittling the tragic subject of domestic violence in any way, but in an effort to communicate my concern, I use a light-hearted example which I believe is illustrative. Depending on his or her age, the reader may remember the very popular television comedy series called, "The Honeymooners." Imagine for a moment that the irrepressible fictional character Ralph Kramden divorced his beloved Alice. Assume further that he remarried a woman who during the course of their marriage accused Kramden of punching her in the nose on a particular occasion. Under this Court's holding in this case, if Mr. Kramden claimed that the blow to his wife was an accident, the prosecution would be entitled to introduce into evidence the many times Kramden threatened to send his ex-wife Alice "to the moon," while displaying a clenched fist. This, notwithstanding the fact that he never followed through on the threats and that the marriage was otherwise harmonious.
[19] Although the introduction into evidence of a previous threat with a gun may seem more compelling than a threat without one, there is no legal difference between them. The majority's opinion is written in general terms and cannot reasonably be read to create a firearm exception to this analysis.
[20] In Michelson v. United States, 335 U.S. 469, 475-76, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the United States Supreme Court stated:

The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.
(Footnotes omitted).
[21] Illustrating the allure of propensity logic, Judge Altenbernd shares a personal note in footnote 3 of Farrill: "My neighbor's dog bit me once. I avoid that dog. No one thinks my use of propensity logic in the matter of the dog is inappropriate." Id.